**O**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL TURNER, | Case No. CV 18-03405 DDP (KSx) |
| Plaintiff, | |
| v. | **ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| CITY OF LOS ANGELES, et al., | |
| Defendants. | [Dkt. 51] |

Presently before the court is a Motion for Summary Judgment filed by Defendants City of Los Angeles and Stephanie Johnigan, Veronica Padilla, Antonio Ramirez, Lidia Leon, Gloria Velez, and Juan Gonzalez.  Having considered the submissions of the parties and heard oral argument that court grants the motion with respect to the failure to train claim alleged against the City of Los Angeles, denies the motion in all other respects, and adopts the following Order.

**I.   Background**

In the afternoon of March 22, 2017, Los Angeles Police Department Officers Kong and Johnigan were dispatched to an office building in downtown Los Angeles. (Dkt# 51-4, Declaration of Lynn Carpenter in Support of Defendants' Motion for Summary Judgment or

1  Partial Summary Judgment, ("Carpenter Decl.") Ex. D at 44:23-45:6.)
2  Building security officers reported that a "homeless-looking" white
3  man in a black hoodie and khaki pants attempted to rob and
4  threatened to rape a female passerby earlier in the morning. (Id.
5  at 44:25-45:3; Carpenter Decl., Ex. L at 44:9-14.)  One of the
6  security guards showed the officers a photo of the suspect.
7  (Carpenter Decl., Ex. E at 29:14-16; Ex. Lat 44:5-8.) Officers Kong
8  and Johnigan then proceeded to 3rd and Hill Streets. (Carpenter
9  Decl., Ex. E at 29:12-19.) As Officers Kong and Johnigan approached
10 3rd Street, they saw Plaintiff Daniel Turner, who matched the
11 description of the earlier report and the photo. (Carpenter Decl.,
12 Ex. E at 30:24-31:7; 31:18-21.) When Turner saw the officers, he
13 began to back away. (Id. at 34:24-35:6.) Officer Kong testified
14 that he told Turner to "come here," to which Turner responded,
15 "no," and then attempted to walk away. (Id. at 35:7-15.)

16    Officer Kong grabbed Turner's hands and attempted to handcuff
17 him. (Id. at 35:14-20.) Turner attempted to bring his hands toward
18 the front of his body to prevent Officer Kong from handcuffing him.
19 (Id. at 36:4-14.) When Turner attempted to pull away, Officer Kong
20 pushed Turner onto a vehicle and used the vehicle to "stabilize"
21 Turner. (Id. at 36:14-17.) The two then ended up on the ground.
22 (Id. at 37:11-15.) Turner alleges that Officer Kong "tackled" him
23 to the ground. (Id. at 37:16-17.) Officer Kong testified that
24 because he believed one of Turner's hands came loose, he used a
25 "twisting motion" to bring Turner to the ground. (Id. at 37:16-17.)
26 Both Turner and Officer Kong were on their sides in the street.
27 (Id. at 38:6-8.)  Officer Kong then put his body weight on top of
28 Turner to prevent him from moving. (Id. at 38:8-10.)

2

1   Officer Johnigan started to request an additional unit, as she
2   saw Officer Kong was "winded." (Carpenter Decl., Ex. D at 57:1-4.)
3   Officer Kong overheard Officer Johnigan requesting the additional
4   unit and yelled out "backup," known to officers as a higher
5   priority call. (Id. at 57:4-11; Carpenter Decl., Ex. E at 40:1-3.)
6   Officer Kong testified that he believed he was losing the struggle
7   with Turner. (Carpenter Decl., Ex. E at 39:18-24.) As the two
8   continued struggling, they gradually moved toward the curb. (Id. at
9   39:1-5.) Turner was on top of a metal grate surrounding tree roots,
10  with Officer Kong on top of him. (Id.) Before backup arrived,
11  Officer Kong gave Turner verbal commands such as, "Put your hands
12  behind your back... stop resisting." (Id. at 40:10-12.) Turner
13  replied, "No." (Id.)

14  Officer Johnigan then told Officer Kong that she would deploy
15  her taser, and Officer Kong agreed. (Carpenter Decl., Ex. D at
16  59:5-11.) Officer Kong warned Turner that if he refused to comply,
17  he would be tased and that it would hurt. (Id. at 59:12-13.)
18  Officer Johnigan, within seven feet of Turner, then deployed her
19  taser in Probe/Dart mode. (Id. at 59:14-19.) The taser darts
20  attached to Turner's body on the back of his right leg and upper
21  thigh buttocks area. (Carpenter Decl., Ex. D at 59:22-60:1.)  The
22  first taser deployment lasted five seconds. (Carpenter Decl. Ex.
23  N.)  Officer Johnigan stated that she did not see the taser darts
24  make contact with Turner's skin, but that Turner yelled out "as if
25  he was in pain." (Id. at 60: 6-7; 109:14-16.)

26  During the struggle, Turner managed to grab and hold onto the
27  metal tree grate with his left hand. (Carpenter Decl., Ex. D at
28  65:20-25.) Officer Leon, one of the responding backup officers,

activated her body-worn video camera and went to the location.
(Carpenter Decl., Ex. F at 60:7-9.) When Officer Leon arrived, she
saw Turner and Officer Kong on the metal grate. (Id. at 50:5-10.)
Officer Leon approached and attempted to free Turner's left hand
from the metal grate. (Id. at 50:25-51:9.) Officer Kong maintained
a "firm grip" on Turner's right hand, but not Turner's left hand,
which Officer Kong was still attempting to control to handcuff.
(Carpenter Decl., Ex. E at 41:23-42:3.) Bodycam video shows, and
Officer Leon testified, that Officer Johnigan's taser wires were
still attached to the taser device when Leon arrived at the scene.
(Carpenter Decl., Ex. F at 48:1-21; Carpenter Decl., Ex. O – VIDEO
at 1:29-1:48.)  At this point, at least six officers were present,
and at least four, including Leon and Johnigan, were attempting to
restrain Turner.

   Officer Johnigan then told Officers Leon and Kong, "Watch out,
I'm gonna drive-stun him." (Carpenter Decl. Ex. O – VIDEO at 1:39-
1:40.) Officer Leon told Johnigan to "stun him." (Id. at 2:10.)
Officer Johnigan then used her taser in drive-stun mode on various
areas of Turner's body. (Carpenter Decl., Ex. D at 61:10-14.)
Someone yelled out indistinctly and grunted several times, but the
bodycam video does not clearly indicate who made those noises.
Turner, with his hood over his ears, repeatedly said "I don't trust
you," then turned his head around to the officers and said, "Will
nobody say something?" (Carpenter Decl., Ex. O – VIDEO at 1:54-
1:58.) Turner also pled with the officers, "Promise you won't take
me to jail," amidst indistinct sounds of scuffling and multiple
officers' voices. (Id. at 2:04-2:36.) Turner's hand was eventually
freed from the metal grate and Turner was handcuffed. (Id. at 2:06-

1   2:42.)  His legs were also hobbled. (Carpenter Decl., Ex. H at

2   39:5-10.) Including the first taser deployment in Probe mode,

3   Officer Johnigan activated her taser eleven times over a period of

4   two minutes and eight seconds. (Carpenter Decl., Ex. N.) The

5   aggregate time the taser was activated amounted to fifty-three

6   seconds. (Id.)

7        Once Turner was handcuffed and seated upright on the curb, he

8   cooperated with officers and answered questions.  Officer Leon

9   began to wipe her hands because, as she stated, she had blood all

10  over her hands.  (Carpenter Decl., Ex O – VIDEO at 4:32.)  Turner

11  was later transported to a nearby hospital, where he was treated

12  for scrapes to his hands and face and the taser darts were removed

13  from his body.  (Dkt #53-2, Declaration of Andrew T. Magaline in

14  Support of Plaintiff's Opposition to Defendant's Motion for Summary

15  Judgment, ("Magaline Decl."), Exs. 7, 12.).

16       Subsequently, Turner was charged with and pleaded no contest

17  to a felony for making criminal threats, in violation of Penal Code

18  §422(a) and a misdemeanor for resisting arrest by Officer Kong, in

19  violation of California Penal Code section 148(a). (Dkt #53-2,

20  Declaration of Andrew T. Magaline in Support of Plaintiff's

21  Opposition to Defendant's Motion for Summary Judgment, ("Magaline

22  Decl."), Ex. 13.; Carpenter Decl., Ex. M at 119-20.)

23       Pursuant to Los Angeles Police Department policy, the

24  department conducted an investigation into officers Kong and

25  Johnigan's use of force during the incident. (Magaline Decl. Ex.

26  8.) The report approved of Officer Kong's use of force, but found

27  that Officer Johnigan's use of the taser was "OUT OF

28  POLICY/TRAINING." (Id.)  The report determined that Johnigan's use

of the taser in probe mode, "to gain the compliance of the suspect for the purpose of ta[]king him into custody . . . appeared not to be an objectively reasonable option."  (Magaline Decl., Ex. 8 at 37.)  The report found each of Johnigan's eleven taser deployments "OUT OF POLICY," warranting "Administrative Disapproval" of each use. (Id. at 38.) Officer Johnigan received "additional training" following the investigation.  (Id.)  Johnigan later testified that the purpose of the training was to "ensure an understanding of the functions of the taser itself," and the training she received included guidance that her "use of the Taser for this matter was not that it was improper." (Magaline Decl., Ex. 2 at 24:4-13.)

Turner brings four claims pursuant to 42 U.S.C. § 1983: (1) an excessive force claim against Officer Johnigan and the other individual defendants; (2) a municipal liability claim against the City of Los Angeles on a ratification theory(3) a municipal liability claim against the City of Los Angeles for failure to train; and (4) a custom, policy, or practice claim against the City of Los Angeles.  Turner also alleges  a state law battery claim against the six individual officers. Defendants now move for summary judgment on all of Turner's claims.

## II.  Legal Standard

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions

1   of the pleadings and discovery responses that demonstrate the

2   absence of a genuine issue of material fact.  See Celotex Corp. v.

3   Catrett, 477 U.S. 317, 323 (1986).  All reasonable inferences from

4   the evidence must be drawn in favor of the nonmoving party.  See

5   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 242 (1986).  If the

6   moving party does not bear the burden of proof at trial, it is

7   entitled to summary judgment if it can demonstrate that "there is

8   an absence of evidence to support the nonmoving party's case."

9   Celotex, 477 U.S. at 323.

10         Once the moving party meets its burden, the burden shifts to

11   the nonmoving party opposing the motion, who must "set forth

12   specific facts showing that there is a genuine issue for trial."

13   Anderson, 477 U.S. at 256.  Summary judgment is warranted if a

14   party "fails to make a showing sufficient to establish the

15   existence of an element essential to that party's case, and on

16   which that party will bear the burden of proof at trial." Celotex,

17   477 U.S. at 322.  A genuine issue exists if "the evidence is such

18   that a reasonable jury could return a verdict for the nonmoving

19   party," and material facts are those "that might affect the outcome

20   of the suit under the governing law."  Anderson, 477 U.S. at 248.

21   There is no genuine issue of fact "[w]here the record taken as a

22   whole could not lead a rational trier of fact to find for the

23   nonmoving party."  Matsushita Elec. Indus. Co. v. Zenith Radio

24   Corp., 475 U.S. 574, 587 (1986).

25         It is not the court's task "to scour the record in search of a

26   genuine issue of triable fact."  Keenan v. Allan, 91 F.3d 1275,

27   1278 (9th Cir. 1996).  Counsel have an obligation to lay out their

28   support clearly.  Carmen v. San Francisco Sch. Dist., 237 F.3d

1026, 1031 (9th Cir. 2001).  The court "need not examine the entire
file for evidence establishing a genuine issue of fact, where the
evidence is not set forth in the opposition papers with adequate
references so that it could conveniently be found."  Id.

**III. Discussion**

    A.   Excessive Force Claim

        1.   Injury to Plaintiff

    Defendants argue first, and very briefly, that they are
entitled to summary judgment on Plaintiff's § 1983 excessive force
claim because Plaintiff "sustained no injury, damage, loss or harm
from Officer Johnigan's use of Taser on Plaintiff."  (Motion at
10:1-2.).  This argument fails.

    In Fourth Amendment excessive force cases, the question is
whether, under the totality of the circumstances, police officers'
actions are objectively reasonable.  Bryan v. MacPherson, 630 F.3d
805, 823 (9th Cir. 2010).  This analysis requires a balancing of
the governmental interests at stake against the intrusion upon an
individual's rights.  Graham v. Connor, 490 U.S. 386, 396-97
(1989).  Of course, "[n]ot every push or shove" violates the Fourth
Amendment, and plaintiffs cannot recover for "provably accidental
or de minimis" bodily intrusions.  Graham, 490 U.S. at 396; Fontana
v. Haskin, 262 F.3d 871, 880 (9th Cir. 2001).  A use of force may
be constitutionally unreasonable, however, "even without physical
blows or injuries," and a plaintiff may be able to recover nominal
damages "even if the plaintiff suffered no actual damage."  Bryan,
630 F.3d at 824; Wilks v. Reyes, 5 F.3d 412, 416 (9th Cir. 1993).
Although some circuits, such as the Fifth Circuit, require a
plaintiff to show "significant injury," there is no such

1   requirement in this circuit.  Wilks, 4 F.3d at 416; Wilenchik v.

2   Ryan, No. CIV10-541TUCDCBGEE, 2010 WL 5644812, at *3 (D. Ariz. Dec.

3   6, 2010).

4       Arpin v. Santa Clara Valley Transportation Agency, 261 F.3d

5   912 (9th Cir. 2001) is not to the contrary.  There, the Ninth

6   Circuit affirmed a grant of summary judgment where the plaintiff

7   "failed to meet her burden of proof of providing specific facts to

8   show that the force being used was unreasonable or that she

9   sustained actual injuries."  Arpin, 261 F.3d at 922.  The record

10  here suffers from no such evidentiary deficiencies.  It is

11  undisputed that Johnigan tased Plaintiff eleven times, and heard

12  him scream out in pain.  Audio from Officer Leon's body camera also

13  includes screams of pain or distress.  As the Ninth Circuit has

14  recognized, tasers inflict "high levels of pain," possible

15  paralysis and loss of muscular control, and wounds from barbed

16  taser darts that require hospitalization.  Bryan, 630 F.3d at 824-

17  25.  Indeed, it is undisputed that here, Plaintiff was hospitalized

18  for, in part, removal of taser barbs from his flesh.  On such a

19  record, Defendants' contention that there is no evidence to support

20  a finding that Johnigan's use of force was unreasonable has no

21  merit.

22          2.  Qualified Immunity

23      "The doctrine of qualified immunity protects government

24  officials from liability for civil damages insofar as their conduct

25  does not violate clearly established statutory or constitutional

26  rights of which a reasonable person would have known."  Pearson v.

27  Callahan, 555 U.S. 223, 231 (2009) (internal quotation marks

28  omitted).  Whether a government official is entitled to qualified

1   immunity depends on "(1) whether there has been a violation of a
2   constitutional right; and (2) whether that right was clearly
3   established at the time of the officer's alleged misconduct."
4   Lal v. California, 746 F.3d 1112, 1116 (9th Cir. 2014).  "[W]hen
5   there are disputed factual issues that are necessary to a qualified
6   immunity decision, these issues must first be determined by the
7   jury before the court can rule on qualified immunity."  Morales v.
8   Fry, 873 F.3d 817, 824 (9th Cir. 2017) (citing commentary to Ninth
9   Circuit Model Civil Jury Instruction 9.34 (2017)); see also
10  Espinosa v. City & Cty. of San Francisco, 598 F.3d 528, 532 (9th
11  Cir. 2010).

12              a.  Constitutional Violation

13       Defendants argue that Officer Johnigan is entitled to
14  qualified immunity claim on Plaintiff's excessive force claim
15  because Johnigan's decision to tase Plaintiff eleven times was
16  objectively reasonable.  (Mot. at 11.)  Whether a use of force was
17  reasonable will depend on the facts of the particular case,
18  including, but not limited to, whether the suspect posed an
19  immediate threat to anyone, whether the suspect resisted or
20  attempted to evade arrest, and the severity of the crime at issue.
21  Graham, 490 U.S. at 396.  Of these factors, whether the suspect
22  posed an immediate threat to anyone is the most important.  Mattos
23  v. Agarano, 661 F.3d 433, 441 (9th Cir. 2011).  The Graham factors
24  are not exclusive, however, and courts analyzing objective
25  reasonableness must consider the totality of the circumstances.
26  Id.

27       Here, Defendants devote approximately one page of their
28  initial briefing to the Graham factors.  There is no dispute that

10

1  Plaintiff was resisting arrest and was suspected of serious crimes,

2  including a felony.[1]  These factors weigh in favor of objective

3  reasonableness.

4      The most important factor, however, whether Plaintiff posed a

5  danger to anyone, is in dispute.  Defendants argue that Plaintiff

6  "posed an immediate threat to the safety of the officers and to

7  others by his . . . continuing active resistance . . . ."  (Mot. at

8  13:25-14:2.)  A reasonable trier of fact could, however, conclude

9  otherwise.[2]  Contrary to Johnigan's later deposition testimony that

10  Plaintiff was "fighting so violently," the police department's own

11  investigation, based in large part upon Johnigan's own report of

12  the incident, concluded that Plaintiff was not "violently resisting

13  or unsafe to approach."  (Magaline Decl., Ex. 8 at 37.)  It is

14  undisputed that Johnigan tased Plaintiff eleven times.  Only four

15  of those instances are clearly discernible from body camera

16  footage, which also reveals that, when Leon arrived on the scene,

17  Johnigan's taser was still connected to wires leading from the

18  taser probe darts.[3]  The video footage also reveals that when Leon

19

20      [1] The Ninth Circuit has observed, however, that even where a
    person has committed a serious crime in the recent past, such
21    completed action does not, in and of itself, justify the use of
    force where the suspect is no longer engaged in unlawful or
22    dangerous activities.  See, e.g. Smith v. City of Hemet, 394 F.3d
    689, 702-03 (9th Cir. 2005) (en banc); Harris v. Roderick, 126 F.3d
23    1189, 1203 (9th Cir. 1997).

24      [2] The court notes that some of the evidence cited by
    Defendants simply does not support their assertions.  The fact that
25    Johnigan and Kong testified, for example, that they parked their
    car and walked up to Plaintiff slowly appears to have little
26    bearing on whether Plaintiff presented a threat to anyone.  (Mot.
    at 13:25.)

27      [3] Defendants acknowledge that, as the Ninth Circuit has held,
28    use of a taser in probe or dart mode is "an intermediate,
                                        (continued...)

11

1  arrived on the scene, three other officers were already partially
2  restraining Plaintiff, who was lying face down on the ground.  By
3  the time Johnigan announced that she was going to "drive-stun"
4  Plaintiff, and tased him for the first time on video, at least six
5  officers, including Leon, were at the scene.  The video also
6  clearly shows that by the time Johnigan tased Plaintiff for the
7  eleventh and final time, he was no longer grabbing the metal tree
8  grate.  At no point are any bystanders visible anywhere in the
9  vicinity.  On this record, a trier of fact could conclude, contrary
10  to Defendants' assertion, that Plaintiff was not a threat to
11  officers or to anyone else.

12              b.   Clearly Established Law

13      Even if Officer Johnigan's use of a taser was objectively
14  unreasonable, she is entitled to qualified immunity if it was not
15  clearly established at the time of the incident that tasing a
16  suspect who posed no danger to anyone would qualify as a Fourth
17  Amendment violation.[4]   Lal v. California, 746 at 1116.   Supreme

18  _____

19          [3](...continued)
   significant level of force."  Bryan, 630 F.3d at 826.  Although
20  Defendants contend that it is undisputed that the latter ten of
   Johnigan's uses of the taser were in drive-stun mode, the support
21  for that assertion is unclear.  As discussed above, the probe wires
   were still attached to the taser when Leon arrived on the scene,
22  and only four instances of tasing are clearly observable after
   Johnigan states, "I'm going to drive-stun him."  The record does
23  not indicate whether it is possible to operate a taser in drive-
   stun mode when the probe wires are still connected to the device.
24  But see Mattos, 661 F.3d at 443.  ("When a taser is used in drive[-
   ]stun mode, the operator removes the dart cartridge and pushes two
25  electrode contacts located on the front of the taser directly
   against the victim. In this mode, the taser delivers an electric
26  shock to the victim, but it does not cause an override of the
   victim's central nervous system as it does in dart-mode.")

27          [4] As discussed above, "when there are disputed factual issues
   that are necessary to a qualified immunity decision, these issues
28                                                    (continued...)

1  Court "caselaw does not requires a [prior] case directly on point
2  for a right to be clearly established, [but] existing precedent
3  must have placed the . . . question beyond debate." <u>Kisela v.</u>
4  <u>Hughes</u>. 138 S.Ct. 1148, 1152 (2018).  The "contours" of the right
5  must be "sufficiently definite that any reasonable official in the
6  defendant's shoes would have understood that he was violating it."
7  <u>Id.</u> at 53. (internal quotation and citation omitted). "[G]eneral
8  statements of the law are not inherently incapable of giving fair
9  and clear warning to officers," but "do not by themselves create
10 clearly established law outside an "'obvious case.'" <u>Id.</u> (internal
11 quotation marks and citation omitted).

12     As an initial matter, before looking to analogous cases, the
13 court notes that the police department's own investigation
14 concluded that, notwithstanding Johnigan's intent to "gain
15 compliance of the suspect for the purpose of ta[]king him into
16 custody," her use of a taser in probe mode "appeared not to be an
17 objectively reasonable option."  (Magaline Decl., Ex. 8 at 37.)
18 Although not determinative of the state of the law at the time of
19 the incident, the report's conclusions appear to reflect the police
20 department's understanding of the applicable legal background.

21     The Ninth Circuit issued opinions regarding the use of tasers
22 in the Fourth Amendment context well before March 2017, when the
23 incident at issue here occurred.  Plaintiff points to the court's
24 2011 decision in <u>Mattos</u>.  There, the Ninth Circuit reviewed an

25
26     [4](...continued)
27 must first be determined by the jury before the court can rule on
   qualified immunity."  <u>Morales v. Fry</u>, 873 F.3d at 824.  For
28 purposes of this discussion, therefore, the court draws all
   evidentiary inferences in favor of Plaintiff.

1   incident in which an officer tased a pregnant woman three times in
2   drive-stun mode when she refused to exit her vehicle after being
3   pulled over for speeding.  Mattos, 661 F.3d at 437.  The woman was
4   not suspected of having committed a serious crime, nor did she pose
5   any threat to the officers.  Id. at 445.  Informed by those
6   factors, the court concluded that officers' decision to tase the
7   women three times in less than one minute was objectively
8   unreasonable and violated the Fourth Amendment.  Id.

9       Defendant argues that the circumstances here are more
10  analogous to those in Marquez v. City of Phoenix, 693 F.3d 1167
11  (9th Cir. 2012).  There, police forced their way through a
12  barricaded bedroom door and encountered walls and furniture smeared
13  with blood, a visibly injured naked woman screaming in the corner
14  of the room, and a heavy-set man holding a motionless three-year-
15  old girl in a choke-hold.  Marquez, 693 F.3d at 1171.  Officers
16  tased the man twice in probe mode, with no effect.  Id.  The man
17  then attacked one of the officers, kicking him in the thighs and
18  groin, before the officer then deployed the taser in drive-stun
19  mode.  Id.  The Ninth Circuit concluded that the officers' use of
20  the taser was not objectively unreasonable.  Id. at 1175.

21      Although neither of these cases is directly analogous to the
22  circumstances here, the facts of this case bear almost no relation
23  to the horrific circumstances in Marquez.  The facts of the instant
24  case bear a closer relationship to Mattos, insofar as Plaintiff was
25  also resisting arrest while posing no danger to anyone. Although
26  Plaintiff's active resistance to being handcuffed is
27  distinguishable from the pregnant woman's passive refusal in
28  Mattos, there is a triable issue as to whether Plaintiff presented

14

1  any danger to officers or bystanders.  In both cases, officers
2  tased plaintiffs repeatedly over a short period of time.

3       The facts here are also similar in many ways to those in
4  Meyers v. Baltimore Cty., Md., 713 F.3d 723, 728 (4th Cir. 2013).
5  There, officers reasonably tased a person who was menacing them
6  with a baseball bat.  Meyers, 7013 F.3d at 728.  After officers
7  took the suspect to ground, however, and even though three officers
8  were sitting on the suspect's back, the tasing officer proceeded to
9  tase the suspect a further seven times.  Id.  In denying qualified
10 immunity to the tasing officer, the court observed not only that
11 the seven additional tasings were excessive, but that, even in
12 2007, it was clear that "[t]he use of any unnecessary, gratuitous,
13 and disproportionate force, whether arising from a gun, a baton, a
14 taser, or other weapon, precludes an officer from receiving
15 qualified immunity if the subject is unarmed and secured."  Id. at
16 735; see also Cyrus v. Town of Mukwonago, 624 F.3d 856 (7th Cir.
17 2010) (finding tasing constituted excessive force when suspect was
18 face down, with two officers on top of him, with his hands
19 underneath him and having already been shocked twice with the
20 Taser); Oliver v. Fiorino, 586 F.3d 898, 907 (11th Cir.2009)
21 ("Quite simply, though the initial use of force (a single Taser
22 shock) may have been justified, the repeated tasering . . . was
23 grossly disproportionate to any threat posed and unreasonable under
24 the circumstances.").

25      In sum, by 2017, it was sufficiently clear that the tasing,
26 let alone repeated tasing, of a suspect who was face down on the
27 ground with three officers on top of him was an excessive use of
28 force.  Officer Johnigan is not entitled to qualified immunity.

1

2       D.   <u>Heck</u> bar

3       Defendants also argue that Plaintiff's claims are barred under

4  <u>Heck v. Humphrey</u>, 512 U.S. 477 (1994).  The "Heck bar" requires

5  dismissal of any claims under 42 U.S.C. § 1983 that, if successful,

6  would imply or demonstrate the invalidity of a conviction based

7  upon the same facts as the § 1983 claim.  <u>Beets v. Cty. of Los

8  Angeles</u>, 669 F.3d 1038, 1042 (9th Cir. 2012).  Of course, a § 1983

9  claim is not <u>Heck</u>-barred simply because it is somehow related to a

10 conviction.  <u>Jackson v. Barnes</u>, 749 F.3d 755, 760 (9th Cir. 2014).

11 Here, Defendants assert that Plaintiff cannot succeed on his

12 excessive force claims without invalidating his conviction for

13 resisting arrest by Officer Kong.  That argument is not well taken.

14 Plaintiff does not take the position that he did not resist Officer

15 Kong's attempts to arrest him.  At most, Plaintiff attempts to

16 distinguish "active resistance" from "violent resistance."  Other

17 courts have made similar distinctions.  <u>See</u>, <u>e.g.</u>, <u>Cyrus</u>, 624 F.3d

18 at 863.  The nature of a suspect's resistance is only one factor,

19 however, in an analysis of whether a use of force is objectively

20 reasonable.  "Force is reasonable only when exercised in proportion

21 to the threat posed."  <u>Id.</u>  Put simply, police officers are not

22 free to use unlimited force simply because a suspect resists

23 arrest.  Plaintiff can succeed on his § 1983 claims without

24 demonstrating or implying that he did not resist arrest.

25 To the extent Defendants argue that Plaintiff is barred from

26 bringing any excessive force claim because he pled no contest to

27 resisting arrest, the argument is baseless.

28      E.   Defendant City of Los Angeles

16

1   Defendants argue Defendant City of Los Angeles is entitled to

2   summary judgment on all claims against it.[5]  A plaintiff alleging

3   civil rights violations under § 1983 may not state a claim against

4   a government entity for the actions of the entity's employees; only

5   the actions of the entity itself give rise to liability.  Monell v.

6   Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 691 (1978).

7   A municipality or local agency is only liable for constitutional

8   violations perpetrated by its employees if the government entity

9   officially adopted and promulgated a "policy, custom, or practice

10  that was the 'moving force' behind the constitutional violation."

11  Gravelet-Blondin v. Shelton, 728 F.3d 1086, 1096 (9th Cir. 2013)

12  (internal quotation and citation omitted).  Defendants main

13  contention is that there can be no Monell violation where there is

14  no underlying constitutional violation.  Defendants are correct, in

15  principle.  See, e.g., Villegas v. Gilroy Garlic Festival Ass'n,

16  541 F.3d 950, 957 (9th Cir. 2008).  As discussed above, however,

17  triable issues remain as to whether Officer Johnigan's eleven taser

18  deployments constituted an objectively unreasonable use of force in

19  violation of Plaintiff's Fourth Amendment rights.

20      Defendants also argue, briefly, that Plaintiff has presented

21  no evidence to support a ratification theory of Monell liability,

22  and that Plaintiff cannot succeed on a failure to train theory

23  based on only a single instance of inappropriate force.  (Mot. at

24  19:28-20:3, 20:7-9.)  A plaintiff may establish Monell liability by

25  proving "that an official with final policy-making authority

26

27      [5] Defendants' initial briefing in support of this argument,
    which applies to three of Plaintiff's claims, spans approximately
28  one page.

17

ratified a subordinate's unconstitutional decision or action and
the basis for it." Gillette v. Delmore, 979 F.2d 1342, 1346-47
(9th Cir. 1992). "[R]atification of conduct . . . can be shown by a
municipality's post-event conduct, including its conduct in an
investigation of the incident." Dorger v. City of Napa, No.
12-CV-440 YGR, 2012 WL 3791447, at *5 (N.D. Cal. Aug. 31, 2012).
Here, it is undisputed that the Los Angeles Police Department found
each of Johnigan's taser deployments "out of policy," and
administratively disapproved of her actions.  Although such a
conclusion might often prove dispositive of a ratification claim,
there is also evidence in the record that, despite the department's
conclusions, Johnigan received only "informal" re-training in the
"functions" of a taser, without any training as to whether, why, or
how her use of the taser was "improper."  A finder of fact could,
therefore, conclude that Johnigan's supervisors ratified Johnigan's
conduct.

Plaintiff provides no substantive opposition to Defendants'
single-incident argument.  Generally, a plaintiff can only succeed
on a failure to train theory of Monell liability by showing a
pattern of violations. Connick v. Thompson, 563 U.S. 51, 70
(2011).  Contrary to Defendant's argument, however, a failure to
train can be shown by a single incident that demonstrates a
"patently obvious" failure to train. Id. at 64; see also Dillman
v. Tuolumne Cty., No. 1:13-CV-00404 LJO, 2013 WL 1907379, at *14
(E.D. Cal. May 7, 2013).  Nevertheless, Plaintiff has presented no
argument or evidence that this is such a case.  Accordingly, the
City of Los Angeles is entitled to summary judgment on Plaintiff's
Third Claim for failure to train.

18

F.   State Law Battery

Lastly, Defendants argue that they are all entitled to summary judgment on Plaintiff's state law battery claim because excessive force tort claims are coextensive with Fourth Amendment claims. Although Defendants' battery arguments are premised upon the conclusion that any use of force against Plaintiff was objectively reasonable, triable issues remain with respect to Plaintiff's Fourth Amendment claims, as explained above.  Accordingly, Defendants are not entitled to summary judgment on Plaintiff's state law battery claim.

**IV.  Conclusion**

For the reasons stated above Defendants' Motion for Summary Judgment is GRANTED, in part, and DENIED, in part.  The motion is granted with respect to Plaintiff's failure to train claim against Defendant City of Los Angeles.  The motion is denied with respect to all other claims.

IT IS SO ORDERED.

Dated: July 24, 2020

DEAN D. PREGERSON
United States District Judge

19